1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 20CR75(RJD)
4                                 :
            Plaintiff,            :
5                                 :
         -against-               : United States Courthouse
6                                 : Brooklyn, New York
   QWALI WILLIAMS,                :
7                                 :
            Defendant.           : Monday, April 19, 2021
8                                 : 9:30 a.m.
                                  :
9                                 :
                                  :
10
   - - - - - - - - - - - - - X
11
       TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
12        BEFORE THE HONORABLE RAYMOND J. DEARIE
            UNITED STATES DISTRICT JUDGE
13
                  A P P E A R A N C E S:
14
   For the Government: MARK LESKO, ESQ.
15                     Acting United States Attorney
                        Eastern District of New York
16                       271 Cadman Plaza East
                         Brooklyn, New York 11201
17                     BY:  ROBERT POLLACK, ESQ.
                            HIRAL MEHTA, ESQ.
18                          Assistant United States Attorney
19  For the Defendant:   FEDERAL DEFEFNDERS OF NEW YORK
                         One Pierrepont Plaza, 16th Floor
20                       Brooklyn, New York 11201
                         BY:MICHAEL PADDEN, ESQ.
21
22
23  Court Reporter:     SOPHIE NOLAN
                         225 Cadman Plaza East/Brooklyn, NY 11201
24                       NolanEDNY@aol.com
   Proceedings recorded by mechanical stenography, transcript
25  produced by Computer-Aided Transcription
```

Proceedings                                    2

1              (In open court.)

2          (The Hon. Raymond J. Dearie, presiding.)

3                 (Defendant present.)

4          THE COURTROOM DEPUTY:  We are on this morning for a

5    suppression hearing.  This is *USA versus Qwali Williams*.

6    Docket number CR20-75.

7              Can I ask the attorneys, please, to note their

8    appearance beginning with counsel for government.

9          MR. POLLACK:  Good morning, Your Honor.  I am Robert

10   Pollack for the United States.  I am accompanied by AUSA Hiral

11   Mehta.

12         THE COURT:  Gentlemen, good morning.

13         MR. MEHTA:  Good morning, Your Honor.

14         MR. PADDEN:  Your Honor, for Qwali Williams, Michael

15   Padden, Federal Defenders.

16         THE COURT:  Good morning.

17         Mr. Williams, good morning.

18         THE DEFENDANT:  Good morning.

19         THE COURT:  I understand we have one witness, Police

20   Officer Rodriguez.  Unless there is anything else, we will

21   proceed to the witness.

22         MR. POLLACK:  The Government will call Officer

23   Jeanette Rodriguez.

24             (Witness approaches.)

25         THE COURTROOM DEPUTY:  Do you swear or affirm that

Proceedings                                        3

1    the testimony you shall give in this case now in hearing

2    before this court will be the truth, the whole truth and

3    nothing but the truth so help you God?

4              THE WITNESS:  I do.

5              THE COURTROOM DEPUTY:  Thank you.  Please take a

6    seat.  State and spell your name for the record.

7              THE WITNESS:  Jeanette Rodriguez.  First name,

8    J-E-A-N-E-T-T-E.  Rodriguez, R-O-D-R-I-G-U-E-Z.

9              THE COURT:

10   DIRECT EXAMINATION

11   BY MR. POLLACK:

12   Q    Good morning, Officer Rodriguez.

13   A    Good morning.

14   Q    Who do you work for?

15   A    New York City Police Department.

16   Q    What do you do for the New York City Police Department?

17   A    I'm a police officer.

18   Q    Is that your title?

19   A    Yes.

20   Q    How long have you been a police officer with NYPD?

21   A    Five and a half years.

22   Q    Are you assigned to a particular precinct?

23   A    Yes, the 75th.

24   Q    How long have you been assigned to the 75th Precinct?

25   A    Five and a half years.

Proceedings                                          4

1    Q     That's the entire time you've been with the NYPD?

2    A     Yes.

3    Q     Of what geographic area does the 75th Precinct consist?

4    A     East New York, Brooklyn.

5    Q     Were you working on January 28 of last year January 2020?

6    A     Yes, I was.

7    Q     What hours were you assigned to work that day?

8    A     5:30 p.m. until 2:00 in the morning.

9    Q     Who were you working with that day?

10   A     Police Officer Argila and Sergeant Radoncic.

11   Q     Did you have a particular deployment plan that day?

12   A     To focus on the robberies, the commercial robberies, in

13   the area.

14   Q     Is there a particular reason why that was the deployment

15   plan that day?

16   A     No, it differs.

17   Q     Did there come a time when you saw someone who you later

18   learned was the defendant Qwali Williams?

19   A     Yes.

20   Q     About what time that day did you see him?

21   A     10 p.m.

22   Q     Do you see Mr. Williams in the courtroom today?

23   A     Yes.

24   Q     Where do you see him?

25   A     Right there (indicating.)

```
                         Proceedings                      5
```

1          MR. POLLACK:  Let the record show that the witness

2    has identified the defendant.

3    BY MR. POLLACK:

4    Q    Where did you see the defendant that day?

5    A    Linden and Crescent.

6    Q    Where is Linden and Crescent?

7    A    In East New York.

8          MR. POLLACK:  Your Honor, can I put up a map?  It's

9    not marked as an exhibit, but just as a visual aid?

10          THE COURT:  Sure.

11          (Map published.)

12   BY MR. POLLACK:

13   Q    Now, I believe if you push with your finger on the screen

14   it's going to mark on the screen.  It's going to mark where

15   the defendant was on the map.

16   A    (Indicating.)

17   Q    Do you know that area well, Officer Rodriguez?

18   A    Yes.

19   Q    Can you describe it generally?

20   A    Linden Boulevard is a busy road and it services roads on

21   both sides running east and west.

22   Q    Is that a high-crime neighborhood?

23   A    Yes.

24   Q    Where were you when you saw the defendant?

25   A    I was driving on Linden Boulevard going eastbound.

```
                        Proceedings                        6
```

1    Q    Can you show us on the map, please?

2    A    When I first saw the defendant you're asking me?

3    Q    Yes, that's correct.

4    A    (Indicating.)

5    Q    When you said you were driving, were you actually driving

6    the car?

7    A    No, I was not.

8    Q    Where were you seated in the car?

9    A    The front passenger seat.

10   Q    Who else was in the car?

11   A    Police Officer Argila and Sergeant Radoncic.

12   Q    And where were they situated?

13   A    Radoncic was sitting in the back, behind the driver's

14   seat, and Argila was driving.

15   Q    What was the lighting like in that area?

16   A    It's well lit.

17   Q    What, if anything, did you think when you saw him?

18   A    That he possibly matched the description as being on the

19   flier.

20   Q    I'm sorry?

21   A    That he possibly matched the description that I had seen

22   on a flier.

23   Q    When did you see that flier?

24   A    Earlier in the week.

25   Q    Where did you see it?

```
                         Proceedings                    7
```

1   A    At the precinct.

2   Q    Do you see a lot of fliers like that at the precinct?

3   A    Yes.

4   Q    Approximately how many?

5   A    A few a day.

6   Q    And what do you do when you see these posters or fliers

7   at the precinct?

8   A    Try to remember the pertinent information and the

9   description, what they're wanted for.

10            THE COURT:  You don't take a copy with you on

11   patrol?

12            THE WITNESS:  No, sir.

13   Q    Do you remember every detail of all these fliers?

14   A    No.

15   Q    What specifically did you remember about that flier?

16   A    It was a flier for a commercial robbery, armed commercial

17   robbery.  The defendant was dressed in a red, white and blue

18   jacket and grey sweatpants, male, black, skinnier medium

19   build, late twenties to early thirties.

20   Q    Did you remember the approximate location where that

21   robbery was supposed to occur?

22   A    Not the exact location.  I just know we were assigned to

23   the zone.

24   Q    So that means you were assigned to the zone where that

25   robbery had occurred?

```
                        Proceedings                       8
```

1    A    Correct.

2    Q    How big is a zone?

3    A    It can be a couple of blocks in each direction.  It could

4    be a few, it could be a whole sector.

5    Q    Did you remember when that robbery had occurred?

6    A    Earlier in the week.

7    Q    I'm going to show you what has been marked as Government

8    Exhibit 2.

9             (Exhibit published.)

10   BY MR. POLLACK:

11   Q    Do you recognize Government Exhibit 2?

12   A    Yes.

13   Q    What is it?

14   A    That's the flier that I'm referring to, the flier that I

15   saw.

16   Q    Is that an accurate copy of the flier that you saw?

17   A    Yes.

18             MR. POLLACK:  Your Honor, I move to admit Government

19   Exhibit 2.

20             MR. PADDEN:  No objection.

21             THE COURT:  Government Exhibit 2 in evidence.

22             (Government Exhibit 2 received in evidence.)

23             MR. POLLACK:  And, Your Honor, there's a hard copy

24   in the binder -- everyone's binder, I think, in case anyone

25   needs it.

```
                          Proceedings                    9
```

1    BY MR. POLLACK:

2    Q    Did you have a copy of the flier with you in the car?

3    A    No.

4    Q    When was the last time you saw it?

5    A    Earlier in the week.

6              THE COURT:  Did you see it by itself or did they

7    show you a bunch of fliers?

8              THE WITNESS:  There were a few laid out on a table.

9    BY MR. POLLACK:

10   Q    So back on January 28 of 2020 when you were driving and

11   you saw the defendant, what about him made you think of the

12   poster or reminded you of the poster?

13   A    Light-skinned male, black; red, white and blue jacket,

14   grey sweats.

15   Q    Was there anything else?

16   A    That it was for an armed commercial robbery.

17   Q    Was there anything else about him, other than the facts

18   that you just named, that reminded you of the flier?

19   A    Well, the location as well.

20   Q    So what, if anything, did you and the other officers

21   decide to do?

22   A    To get a better look at him and investigate further.

23   Q    At that point, were you planning to arrest him as a

24   suspect in the robbery?

25   A    No.

```
                           Proceedings                    10
```

1   Q    At that point were you planning to search him?

2   A    No.

3   Q    So what happened then?

4   A    We made a u-turn, came onto the other side of Linden and

5   drove up behind him.

6   Q    Was this a marked car?

7   A    No, unmarked.

8   Q    Were you wearing a uniform?

9   A    No, I was not.  I was in plain clothes.

10  Q    Were the other officers in uniforms?

11  A    No, they were also in plain clothes.

12  Q    So what happened then?

13          THE COURT:  Well, let me just get this straight.  In

14  other words, you are heading in the opposite direction from

15  the defendant?

16          THE WITNESS:  When I first saw him; correct.  And

17  then we made a u-turn, came up going westbound on, Linden, and

18  the defendant was on the sidewalk heading westbound on Linden.

19          THE COURT:  Was he alone?

20          THE WITNESS:  Yes.

21  Q    Was this the north sidewalk or south sidewalk?

22  A    The north.

23          THE COURT:  North?  Now I'm confused.  Go ahead.

24  BY MR. POLLACK:

25  Q    So, Officer Rodriguez, looking at the map, I see that

Proceedings                                    11

1   Linden Boulevard has a main lane in each direction and what

2   looks like a frontage road or service road on each side?

3   A    Correct.

4   Q    When you were coming up on the defendant, where were you?

5   A    On the service road on the north side of Linden.

6   Q    And where was the defendant?

7   A    On the north side on the sidewalk of Linden.

8   Q    What intersection?

9   A    Linden and Crescent.

10            THE COURT:  So, the sidewalk splits Linden

11  Boulevard?

12            THE WITNESS:  There's a sidewalk on both sides.

13  There's a sidewalk, service road, Linden Boulevard, service

14  road, sidewalk.

15            THE COURT:  Okay.

16  BY MR. POLLACK:

17  Q    So what happened then after you pulled up behind the

18  defendant?

19  A    We observed him for a little bit and then eventually

20  pulled up alongside him.

21  Q    What did you do then?

22  A    I identified myself and I asked him to stop so I could

23  speak to him for a second.

24  Q    How did you identify yourself?

25  A    I showed him my shield.

Proceedings                                    12

1   Q    Were you in the vehicle?

2   A    I was still in the vehicle.

3   Q    Did you get out of the vehicle?

4   A    Yes, I did.

5   Q    Why did you get out of the vehicle?

6   A    To approach him, to be able to speak him, because there

7   was an object in his front pocket that I wanted to get a

8   better look at.

9   Q    And what specifically do you remember saying after you

10  stepped out of the vehicle?

11  A    I said, "Police.  Stop.  Can I talk to you for a second?"

12  Q    What, if anything, did you see about the defendant as you

13  approached him?

14  A    That his jacket was weighing down on the left side, that

15  he had his hands in his pockets, that there was a bulge in the

16  left pocket.

17  Q    Did you ask him to take his hands out of his pockets?

18  A    Yes, I did.

19  Q    Did he?

20  A    No, not at first.

21  Q    Did he eventually?

22  A    Yes.

23  Q    Did he take both hands out at the same time?

24  A    Yes.

25  Q    And what did you think when you saw the bulge on the left

Proceedings                                          13

1   side?

2   A    That it could possibly be a weapon.

3   Q    Were you concerned for your safety?

4   A    Yes.

5   Q    At that point, as you approached him, where were Officer

6   Argila and Sergeant Radoncic?

7   A    Argila was still in the car.  Radoncic had already exited

8   and he was coming around the back side of the car.

9   Q    What did you do then?

10  A    I approached him, I placed my hand on the front of his

11  jacket where the bulge was.

12  Q    When you placed your hand on the jacket, in that moment,

13  where were Officer Argila and Sergeant Radoncic?

14  A    Coming up right beside me.

15  Q    Why did you do that?

16  A    Because I wanted to feel that bulge.  I wanted to see if

17  it was as heavy as I thought it was and what I thought it was.

18  Q    What, if anything, did you feel?

19  A    A gun.

20  Q    What does it mean to feel a gun?

21  A    It feels heavy.  It feels L-shaped.  It's heavy.  It was

22  weighing down his pocket.

23  Q    And at that point were Officer Argila and Radoncic with

24  you?

25  A    Alongside of me, yeah.

```
                         Proceedings                    14
```

1  Q    What did you do then?

2  A    I grabbed it, felt it, I know it was a gun at that point.

3  I told them "92," to place him under arrest.

4  Q    What does 92 mean?

5  A    To place somebody under arrest.

6  Q    And what happened?

7  A    They grabbed his arms and they placed him under arrest.

8            THE COURT:  Were any guns drawn at any point?

9            THE WITNESS:  No, sir.

10  BY MR. POLLACK:

11  Q    Once they grabbed his arms and placed him under arrest,

12  what did you do then?

13  A    Removed the gun, put it in my pocket.  Removed the cell

14  phone and his headphones and his charger, and then put him in

15  the back of the vehicle.

16  Q    So when you removed the object from his pocket that you

17  had felt, what exactly was it?

18  A    It was a gun.

19  Q    Was it just a gun?

20  A    It was a gun wrapped in a blue bandanna.

21            MR. POLLACK:  I'm going to show you a disk marked

22  Government Exhibit 1.

23  Q    Have you seen this disk before?

24  A    Yes.

25  Q    Have you reviewed the contents of this disk?

```
                        Proceedings                      15
```

1   A    Yes.

2   Q    What is on this disk?

3   A    Body cam footage from myself and my partner.

4   Q    Have you previously reviewed those body cam videos?

5   A    Yes, later that day.

6            MR. POLLACK:  Your Honor, the Government moves to

7   admit Government Exhibit 1.

8            THE COURT:  Is it 1?  You have a list here 1-A, B

9   and C.  Are they all part of 1?

10            MR. POLLACK:  There are three files, 1-A, 1-B and

11  1-C.

12            THE COURT:  All right.

13            There is no objection, is there?

14            MR. PADDEN:  No, Judge.

15            THE COURT:  Received.

16            (Government Exhibit 1 received in evidence.)

17            THE COURT:  What day of the week was this?

18            MR. POLLACK:  January 28, 2020?

19            THE WITNESS:  I don't remember.

20            MR. PADDEN:  It was a Tuesday.

21            THE COURT:  Thank you.

22            Had you made any arrests prior to this incident?

23  Had you or your team made any arrests before this incident?

24            THE WITNESS:  On that same day?

25            THE COURT:  Yes.

```
                        Proceedings                    16
```

1          THE WITNESS:  Not on that same day.

2          THE COURT:  If there is such a thing as an average

3    night in a high crime area, how many arrests would you make on

4    an average night?

5          THE WITNESS:  It could be one.  I would say it could

6    be one, if any.

7          THE COURT:  I see.

8          MR. POLLACK:  I'm going to play a little bit of

9    Government Exhibit 1-A, which is the first file on the disk.

10         (Video played.)

11         (Video paused.)

12   BY MR. POLLACK:

13   Q    Now, Officer Rodriguez, based on what you can see on the

14   video, can you tell whose body camera this is?

15   A    Sergeant Radoncic.

16   Q    And how can you tell that?

17   A    Because he's in the back seat.

18         (Video played.)

19         (Video paused.)

20   BY MR. POLLACK:

21   Q    I'm stopping here at 22:22:18, and on the right side of

22   the frame, there's somebody's leg.  Whose leg is that?

23   A    That's mine.

24         (Video played.)

25         (Video paused.)

```
                        Proceedings                    17
```

1  BY MR. POLLACK:

2  Q    So that's happening here?

3  A    We're driving up behind him.

4  Q    What is your understanding of why there's no audio in

5  this part of the video?

6  A    The audio doesn't kick in until 30 seconds after you

7  activate it.

8            (Video played.)

9            (Video paused.)

10 BY MR. POLLACK:

11 Q    So I'm pausing at 22:22:31.  What's happening now?

12 A    We're pulling up alongside of the suspect.

13 Q    How far away is he from you?

14 A    He's close to me, he's right -- he's on the sidewalk.

15 Q    I will play a few seconds.

16           (Video played.)

17           (Video paused.)

18 BY MR. POLLACK:

19 Q    I'm pausing again, this is 22:22:37.  What do you see in

20 this frame?

21 A    You can see the defendant has his hand still in his

22 pocket.  He's standing there on the sidewalk.

23           THE COURT:  Had you gotten out of the car yet?

24           THE WITNESS:  Yes.

25           THE COURT:  That's you?

Proceedings                              18

1          THE WITNESS:  That's me approaching, correct.

2    BY MR. POLLACK:

3    Q    What, if anything, are you saying at this point?

4    A    I'm asking him to take his hand out of his pocket.

5    Q    I'll play a few more seconds.

6              (Video played.)

7              (Video paused.)

8    BY MR. POLLACK:

9    Q    I'm stopping at 22:22:40.  What's happening here?

10   A    He still has his hand in his pocket and I'm reaching

11   forward, still asking him to take his hand out as I totally

12   placed my hand on that front pocket.

13   Q    You said a few seconds ago that this is Sergeant

14   Radoncic's camera.  So is it accurate that he was still behind

15   you at this point?

16   A    Yes.

17   Q    And where was Officer Argila at this point?

18   A    He was still coming around the front of the vehicle.

19             MR. PADDEN:  Excuse me?  Pardon me for interrupting

20   but this is 1-A we're looking at right now?

21             MR. POLLACK:  Yes.

22             (Video played.)

23             (Video paused.)

24   BY MR. POLLACK:

25   Q    So this is time stamped 22:22:41.

```
                         Proceedings                        19
```

1          It looks like you are just out of the frame.  What's

2     happening here?

3     A    I'm grabbing on to that pocket.

4          (Video played.)

5     Q    Who is that speaking?

6     A    That's Sergeant Radoncic.

7     Q    He's the one that's wearing the body camera that's

8     capturing this?

9     A    Yes.

10          (Video played.)

11          (Video paused.)

12    BY MR. POLLACK:

13    Q    I'm pausing at 22:22:47.

14          Who's the person in the blue who just appeared in

15    the frame?

16    A    That's Police Officer Argila.

17    Q    So where did he just come from?

18    A    He came front the front driver's seat, around the front

19    of the vehicle.

20    Q    So is this the moment when he first arrived at the scene?

21    A    Yes.

22          (Video played.)

23          (Video paused.)

24    BY MR. POLLACK:

25    Q    I'm stopping at to 22:22:50.

```
                    Proceedings                    20
```

1              What just happened?

2    A    I told Sergeant Radoncic and Police Officer Argila to

3    place him under arrest.

4    Q    How did you tell them that?

5    A    92.

6              THE COURT:  92 signifies what?

7              THE WITNESS:  Arrest.

8              THE COURT:  It doesn't say anything about a gun?

9              THE WITNESS:  No.

10             THE COURT:  But under the circumstances, presumably,

11   given what you tapped and so forth, you knew he had a gun?

12             THE WITNESS:  Correct.

13   Q    I will play it again for a few seconds.

14             (Video played.)

15             (Video paused.)

16   BY MR. POLLACK:

17   Q    So you're out of the frame here.  I'm pausing again at

18   22:23:04.

19             What are you doing at this point?

20   A    I'd removed the firearm already at this point.

21   Q    I will play it again.

22             (Video played.)

23             (Video paused.)

24   BY MR. POLLACK:

25   Q    So what's happening there?

```
                        Proceedings                    21
```

1   A    We're still checking and making sure he doesn't have a

2   secondary weapon on him.

3   Q    So, at this point, is it accurate that he's already under

4   arrest?

5   A    Yes.

6   Q    I'm going to stop this video here.  And I will briefly

7   play Government Exhibit 1-C.

8                   (Video played.)

9                   (Video paused.)

10  BY MR. POLLACK:

11  Q    Based on what you see in this video, can you tell whose

12  camera captures this?

13  A    Yes, that's mine.

14  Q    How can you tell?

15  A    I'm directly in front of him.

16  Q    I will play it again.

17                  (Video played.)

18                  (Video paused.)

19  BY MR. POLLACK:

20  Q    Now, I'm pausing at time stamp 22:22:54, and we just saw

21  the gentleman in the blue on the left side of the frame.  So,

22  based on what was in the last video, what's happening here?

23  A    They're coming up alongside of me at this point.  I'm

24  directly in front of him, I had my hand in his pocket.

25  They're intend to surround him on both the left and the right

Proceedings                                                22

1   side me.

2   Q    So at the start of this video is your hand already in his

3   pocket?

4   A    Yes.

5            (Video played.)

6            (Video paused.)

7   BY MR. POLLACK:

8   Q    When did you activate your body cam?

9   A    When I was already in front of him.

10  Q    Is there any reason that you activated it then and not

11  earlier?

12  A    I hadn't realized that mine was off until I looked over

13  at Argila and his was on.

14  Q    So you forgot to activate it until you saw --

15  A    Correct.

16  Q    How could you tell that Officer Argila's was on?

17  A    The light was blinking.

18  Q    What did you do after removing the gun?

19  A    I placed him inside the vehicle and brought him back to

20  the precinct.

21  Q    When you got back to the precinct did there come a time

22  when you looked at the wanted poster that you had previously

23  seen?

24  A    Yes, I did.

25  Q    After seeing that, did you continue to believe that

```
                    Proceedings                    23
```

1  Mr. Williams may be the suspect in the prior robbery?

2  A    Yes.

3  Q    Sitting here today, do you believe that he was that

4  suspect?

5  A    No.

6  Q    Did that change, in your mind, anything about the arrest?

7  A    No.

8         MR. POLLACK:  Nothing further, Your Honor.

9         THE COURT:  A couple of questions.  I just want to

10  get the sequence down.

11         You were the first to approach Mr. Williams?

12         THE WITNESS:  Correct.

13         THE COURT:  And you noticed a bulge in his left

14  pocket did you say?

15         THE DEFENDANT:  Yes, his front left pocket.

16         THE COURT:  You asked him to take his hands out of

17  his pocket?

18         THE WITNESS:  Correct.

19         THE COURT:  At first he did not?

20         THE WITNESS:  Uh-hum.

21         THE COURT:  And then how long thereafter did he

22  comply?

23         THE WITNESS:  Until I was right in front of him.

24         THE COURT:  And that's when you reached down and

25  patted the pocket?

1          THE WITNESS:  Yes, I kept my hand on it.

2          THE COURT:  You were pretty much convinced at that

3   point that he had a weapon?

4          THE WITNESS:  Yes.

5          THE COURT:  And what exactly happened after that;

6   he's standing there with his hands to his side, I assume?

7          THE WITNESS:  Hands to his side, correct.

8          THE COURT:  You feel the weapon -- did you take the

9   weapon immediately?

10          THE DEFENDANT:  No.

11          THE COURT:  You didn't?

12          THE WITNESS:  No.

13          THE COURT:  Okay.  You said 92, or whatever it is?

14          THE WITNESS:  I kept my hand on it and waited for my

15   partners to get closer to him and then I told them 92.

16          THE COURT:  Okay.  And then they put him in

17   handcuffs?

18          THE WITNESS:  Yes, and then they removed him.

19          THE COURT:  Okay.  Mr. Padden.

20          MR. PADDEN:  Yes, sir.

21          THE COURT:  Your witness.

22          MR. PADDEN:  Thank you.

23   CROSS EXAMINATION

24   BY MR. PADDEN:

25   Q    Good morning, Officer Rodriguez.

1    A    Good morning.

2    Q    My name is Michael Padden from the Federal Defenders

3    office.  I don't think we have ever met, have we?

4    A    No, sir.

5    Q    On other cases or anything?

6    A    No, sir.

7    Q    Okay.  I didn't think so.

8         Obviously, I represent Qwali Williams.

9    A    Uh-hum.

10   Q    So I'm going to ask you some questions about what

11   happened that night from his perspective.  Okay?

12   A    Okay.

13        MR. PADDEN:  If we could have the wanted poster up,

14   I guess that's Exhibit 2.

15   BY MR. PADDEN:

16   Q    Yeah, let's take a look at that.  Normally I would be

17   coming up to you and showing you the picture, but we're not

18   doing that these days.

19        (Exhibit published.)

20   BY MR. POLLACK:

21   Q    That picture, that wanted poster -- when you said poster,

22   that was like an 8-by-11 sheet of paper; correct?

23   A    Yes.

24   Q    Okay.  So it wasn't a big blown-up poster tacked up on

25   the wall or anything?

Rodriguez - cross - Padden                26

1   A    No.

2   Q    And it was one of a number of similar sheets of paper,

3   similarly constructed, wanted for various crimes in your

4   precinct; correct?

5   A    Yes.

6           THE COURT:  You said it was on a table?

7           THE WITNESS:  Yes.

8           MR. PADDEN:  Yeah, I was getting to that next.

9   BY MR. PADDEN:

10  Q    It wasn't up on the wall?

11  A    No.  Usually they print out quite a few of them, so you

12  can find them located in one of the rooms where we gather,

13  were we muster together, or upstairs or different locations.

14  Q    So, basically, you've got a table of wanted sheets and

15  part of your duties or job, if you will, would be on the

16  lookout for characters that are depicted in these posters;

17  correct?

18  A    Correct.

19  Q    All right.  And you looked at several of them that night;

20  correct?

21  A    Yes.

22  Q    Okay.  Focusing in on Exhibit 2, is that the only

23  information you had about that particular incident before you

24  went out on the patrol that night?

25  A    Yes.

Rodriguez - cross - Padden                    27

1   Q    Just what was in that poster?

2   A    Yes.

3   Q    You hadn't heard any radio runs or 911 calls or anything

4   in connection with that case?

5   A    No.

6   Q    Okay.  Looking at that poster, all right, it doesn't

7   actually contain a description of the individual in it;

8   correct?

9   A    Correct.

10  Q    But you can see -- and I will focus on it, for obvious

11  reasons, on the jacket that that person is wearing; correct?

12  A    Yes.

13  Q    It's a winter jacket, right?  It is basically a black

14  jacket with a red stripe and white borders across it; correct?

15  A    Yes.

16  Q    And there's a brand name on it, if you will.  Can you

17  recognize that?

18  A    No, I do not.

19  Q    Does the term Helly Hansen ring any bells to you?

20  A    No.

21  Q    Are you familiar with that brand of sportswear?

22  A    No, sir.

23  Q    Okay.  But there is on the left breast, in the red

24  portion, like an HH; correct?

25  A    Yes.

1  Q    Okay.  And essentially, that jacket is all black except

2  for that band that goes across the chest and across the arms;

3  correct?

4  A    Yes.

5  Q    And that goes around the back, too, as far as you can --

6  well, can you tell if it goes around the back?

7  A    I can not.

8  Q    Fair enough.  But basically, the colors there are black

9  jacket, sort of a reddish stripe with white borders; correct?

10  A    Yes.

11  Q    All right.  And obviously the hood is up; correct?

12  A    Yes, it is.

13  Q    And there is something on the top of the hood, some kind

14  of patch.  I can't really make it out what it is, but do you

15  see like sort of like a silvery square on the top there?

16  A    Yes, I see it.

17  Q    All right.  It gives you the date of the occurrence of

18  that particular robbery; correct?

19  A    Yes, it does.

20  Q    And that's January 23rd; right?

21  A    Yes.

22  Q    And that was on Blake Avenue; correct?

23  A    Yes.

24  Q    Okay.  And that's all within the 75 Precinct; correct?

25  A    Yes, it is.

Rodriguez - cross - Padden                    29

1   Q    You know, while we're on that subject, you referred to

2   the area where you ultimately arrested Qwali Williams as a

3   high crime area?

4   A    Yes.

5   Q    Would you characterize that particular location, that

6   specific location of Crescent and Linden as a particularly

7   high crime area?

8   A    Yes.

9   Q    Would you consider the entire 75 Precinct kind of a high

10  crime area?

11  A    Some areas more than others.

12  Q    Well, Linden and Crescent -- Linden Boulevard, as you get

13  out close to Crescent, is a busy street; right?

14  A    Yes, it is.

15  Q    Pretty much all the time, right?

16  A    Yes, it is.

17  Q    You have traffic coming both ways, right?

18  A    Correct.

19  Q    And you've got commercial establishments on Linden near

20  Crescent; right?

21  A    Correct.

22  Q    There's a dollar store on the corner?

23  A    Yes.

24  Q    There's a fried chicken joint -- that's what I call them,

25  on the corner?

1    A    Yes.

2    Q    All right.  A little further up the block is a fire

3    station?

4    A    Yes.

5    Q    And that's all kind of close to the intersection of

6    Linden and Crescent?

7    A    Yes.

8    Q    All right.  So that there are commercial establishments

9    in that area?

10   A    Yes.

11   Q    And a fire station; correct?

12   A    Yes.

13   Q    All right.  Now, let's go, let's take it right there to

14   Linden and Crescent the first time that night you saw the

15   individual that you ultimately arrested and identified as

16   Qwali Williams; correct?

17   A    Yes.

18   Q    All right.  You are traveling -- let me see if I get this

19   right.  When you first see him, you are traveling westbound on

20   Linden; correct?

21   A    Eastbound.

22   Q    Eastbound, okay.  I get them backwards.

23        And would Qwali have been walking in the direction

24   towards your vehicle at that point?

25   A    Yes.

Rodriguez - cross - Padden                    31

1   Q    So you saw him from the front first; right?

2   A    Yes.

3   Q    All right.  And then you did a u -- you went beyond him,

4   did a u-turn, and approached him from his back; correct?

5   A    Yes.

6   Q    Okay.  And that would be then westbound?

7   A    Correct.

8   Q    All right.  So when you say you saw him walking

9   eastbound, you had to do the u-turn and come westbound when

10  you finally arrested him; right?

11  A    Correct.

12  Q    Okay, now I get it.  I didn't know about the u-turn.

13       Okay.  So you see him and you are in the second

14  major lane away from him when you first see him; right?

15  A    Correct.

16  Q    Because you got the -- the westbound -- no, sorry, you

17  are traveling west; right?

18  A    I'm traveling eastbound on Linden.

19  Q    Okay.

20  A    He's on my left-hand side.

21  Q    So your left-hand side, at that point, and that would be

22  across the westbound lane?

23  A    Correct.

24  Q    Okay.  So you've got two lanes of traffic between you and

25  him when you first see him; right?

1    A    Yes.

2    Q    Okay.  Plus you've got the service roads?

3    A    Yes.

4    Q    And basically, Linden Boulevard is like -- you've got a

5    service road on the east, a service road on the west.  You've

6    got the two main lanes, correct, west and east, and then

7    you've got one in the middle too; right?

8    A    Yes.

9    Q    So you've got, like, a five-lane highway basically?

10   A    Yes.

11   Q    In the middle of Brooklyn.

12   A    Correct.

13   Q    Okay.  So then you first see him coming in your direction

14   and you are in your car, you are in the left passenger seat;

15   correct?

16   A    Yes, the right passenger seat.

17   Q    Right, yeah, yeah, the right passenger seat.  The driver

18   is on the left.  And do you see anybody else on the street?

19   A    A couple, yeah.

20   Q    With him, ahead of him, behind him?

21   A    He was walking past them.  There were a couple of people

22   at the bus stop and then he walked past them.

23   Q    And that's another thing; there's a bus stop right there?

24   A    Yes.

25   Q    And there were people at the bus stop; correct?

Rodriguez - cross - Padden                              33

1    A    Two.

2    Q    And he walked right by them; correct?

3    A    Yes, he did.

4    Q    You saw him walk by them?

5    A    Yes, I did.

6    Q    And so then you go beyond where he is, which would be

7    across three lanes to your left; correct?

8    A    Yes.

9    Q    How far beyond him do you go before you make that u-turn?

10   A    I was about a block behind him at that point.  I had to

11   drive past him to make the u-turn to come up behind him.  It

12   was only two blocks' distance.

13   Q    Yeah, I get that, but I just want to make it clear that

14   there's no median strip between where you were and he was;

15   correct?

16   A    At the time of approach?

17   Q    Yes.

18   A    No.  He was on the sidewalk and I was on the right-hand

19   side of the vehicle so the sidewalk was right next to me.

20   Q    Yeah, I'm talking about before you made the u-turn.  You

21   didn't have to cross the median strip; correct?

22        Well, let me withdraw that.

23        What I'm calling a median strip, I'm thinking of

24   like an elevated -- like, you know, it's part grass and

25   benches and stuff like that.  It's all surface; correct?

1   A    Yes, it is.

2          Are you asking if I drove over it?

3   Q    Right.

4   A    No, I did not drive over it.

5   Q    Right, there's nothing to drive over.  You can make a

6   u-turn pretty much anywhere; right?

7   A    Every few blocks they have a space where you can very

8   easily merge over to either the --

9   Q    Right, right, right.  But there's no physical hurdle to

10  get over?

11  A    No.

12  Q    It's just a matter of turning?

13  A    Correct.

14  Q    And you went a little beyond him, made your u-turn and

15  came up behind him; correct?

16  A    Yes.

17  Q    When did you came up behind him, was anybody else near or

18  around him?

19  A    No.

20  Q    This was after he has passed the bus stop; right?

21  A    Yes.

22  Q    All right.  And there's pretty much nobody else out on

23  the street; aside from those people waiting for the bus, he's

24  just kind of walking along on the street; correct?

25  A    Yes.

1   Q    Okay.  Normal pace?

2   A    I would say so, yes.

3   Q    Yeah.  Well, while we're right here -- I don't want to

4   forget -- this is around ten o'clock at night, January 28,

5   2020; right?

6   A    Yes.

7   Q    It was cold out?

8   A    Yes, it was.

9   Q    You were dressed in winter attire; correct?

10  A    Yes.

11  Q    You had a bomber jacket with like a hoodie underneath, so

12  you had to dress for the cold; right?

13  A    Yes.

14  Q    Okay.  And the jacket that Qwali was wearing that night

15  was a winter jacket; right?

16  A    Yes.

17  Q    Okay.  At any point in the course of that evening did you

18  discover that Qwali was wearing gloves?

19  A    No.

20  Q    You didn't voucher any gloves, you didn't seize any

21  gloves from him; correct?

22  A    No.

23  Q    No gloves, Qwali didn't have gloves on him that night;

24  right?

25  A    No gloves.

Rodriguez - cross - Padden                     36

1   Q    So when he had his hands in his pockets, it could have

2   been because they were cold; right?

3   A    It could have been, yes.

4   Q    So then you come around and make your u-turn and you get

5   out of the car and you approach him; right?

6   A    Yes.

7   Q    You are the first one out of the car?

8   A    Yes.

9   Q    Because you were actually the closest to him physically;

10  correct?

11  A    Yes, I was.

12  Q    Because you've got Officer -- what is it?  Argilo?

13  A    Argila.

14  Q    Yeah.  He's driving; right?

15  A    Yes.

16  Q    And Sergeant Radoncic is in the back seat?

17  A    Yes.

18  Q    Back driver's side; right?

19  A    Yes.

20  Q    Okay.  So you pull up next to Qwali, and he is right

21  there on the sidewalk, and you jump out of your car and

22  approach him.  You, like, lead the approach to him; right?

23  A    Yes.

24  Q    You're the first to get to him?

25  A    Yes.

Rodriguez - cross - Padden                    37

1    Q    And you assume that your fellow officers are coming

2    around too, but you didn't see hem at that point; right?

3    A    That is correct.

4              MR. PADDEN:  All right.  Now, if we could play 1-A

5    without pausing it, just -- I pretty much want the area that

6    you played just without the pauses.

7              (Video played.)

8              (Video paused.)

9    BY MR. PADDEN:

10   Q    Take a look.  You can watch it on your monitor there.

11   This is after you've made the u-turn; right?

12   A    Yes.

13   Q    Okay.

14             (Video played.)

15             MR. PADDEN:  Actually, can I contradict myself and

16   close it?  Pause it for a second?

17             (Video paused.)

18   BY MR. PADDEN:

19   Q    All right.  I hear some sound on that.

20             Do you hear that sound?

21   A    I do.

22   Q    What is that?

23   A    Just crackling.  I'm not sure.

24   Q    Does that suggest that the body cam is actually on, the

25   audio portion is on at that point?

1   A    No.  It doesn't kick in until 30 seconds after.

2   Q    Yeah, I know.  I mean, I'm familiar with that.  That

3   comes up in a lot of cases where you don't hear anything and

4   then all of a sudden it comes on, but I'm hearing sound.  Is

5   it maybe the engine running, is it possible that it was on?

6   A    I mean, the car was running, but that's not what you're

7   hearing in the video.

8   Q    Yeah.  You don't know what I'm hearing, I don't know what

9   I'm hearing.  I'm just wondering if you could add light.

10             All right, keep going please.

11             (Video playing.)

12             (Video paused.)

13  BY MR. PADDEN:

14  Q    Now the sound comes on.  Whose body cam is this now?

15  A    Sergeant Radoncic.

16  Q    All right, let's just use this as an opportunity here.  I

17  mean, you will have more, and obviously, it's in evidence.  I

18  want you to focus on the jacket that Qwali was wearing that

19  night.  Okay?

20  A    Yes.

21  Q    Okay.  Now, his jacket is red, white and blue; right?

22  A    Yes.

23  Q    And you also see there's a label on the chest of his

24  jacket too?

25  A    Yes.

Rodriguez - cross - Padden                           39

1    Q    Do you recognize the Tommy Hilfiger label?

2    A    Yes.

3    Q    Okay.  And it's part of that red, white and blue

4    collection of Hilfiger's, which is pretty common enough;

5    right?

6            The Tommy Hilfiger label is pretty well known;

7    correct?

8    A    Correct.

9    Q    All right.  And that jacket is red, white and blue;

10   correct?

11   A    Yes.

12   Q    Okay.  And would it be fair to say that it's kind of a

13   patchwork of red, white and blue?

14   A    What do you mean by patchwork?

15   Q    Well, squares, in different colors.  For example, on the

16   chest, it's big white squares; right?

17   A    Yes.

18   Q    Well, I'd say it's kind of a rectangle when you put them

19   together, but there's a square on the side of the zipper;

20   right?

21   A    Yes.

22   Q    And the white goes all the way across; right?

23   A    Yes.

24   Q    It goes all the way around the back, too?

25   A    Correct.

1  Q    And then you go -- well, you may need to advance the

2  tape -- at some point you see the whole jacket; correct?

3  A    Uh-huh.

4  Q    It also has similar patches of white below -- you can

5  kind of see the blue stripe in the middle; right?

6  A    Yes.

7  Q    Okay.  If you're not sure we can advance it.  It's going

8  to come up.

9  A    I need a better view of it.

10  Q    Yeah, all right.  But in any event, you have the white

11  patches up top, there's a blue stripe in the middle; correct?

12  And the white patches below?

13  A    Correct.

14  Q    And that pattern continues on the back; right?

15  A    Yes.

16  Q    Right.  And the sleeves, there's a white, wide white

17  patch on both sides of the sleeve parallel to the patches on

18  the front; correct?

19  A    Yes.

20  Q    And they're separated by red and blue stripes; correct?

21  Blue?

22  A    Yes.

23  Q    And you've got blue on the shoulders and you've got

24  red -- right, you've got blue on the shoulders; you can see it

25  in that picture?

1    A    Yes.

2    Q    Below that, the white again, and above that you've got

3    red -- you've got it on the front of the shareholders; right?

4    A    Yes.

5              THE COURT:  May I ask sort of an obvious question?

6              MR. PADDEN:  Yes.

7              THE COURT:  Where is the jacket?

8              MR. PADDEN:  I don't think we know, Judge.  I think

9    it kind of disappeared between Riker's Island and...

10             THE COURT:  Is that right?  We don't have the

11   jacket?

12             MR. POLLACK:  Your Honor, we don't have it today.  I

13   believe it is vouchered in evidence.

14             THE COURT:  Oh, it is?

15             MR. POLLACK:  I believe it is, Judge.

16             THE COURT:  All right.

17             MR. PADDEN:  I don't know.

18             Well, why don't you continue the tape then.

19             (Video played.)

20             (Video paused.)

21   BY MR. PADDEN:

22   Q    I think we've kind of covered it, but ultimately you

23   agree that his jacket is red, white and blue and it's in a lot

24   of different patches; correct?

25   A    Yes.

1  Q    Would it be fair to say that the most prevalent color on

2  the jacket is white?  More white than anything else?

3  A    I would say it's -- it was equal with all the colors.  It

4  has as much white as you have red and you have blue also.

5  Q    But you have big patches of white, both front and back?

6  A    The chest was white, yeah.

7  Q    Okay.

8            MR. PADDEN:  This is the tape you played; right?

9            MR. POLLACK:  Yes.

10            MR. PADDEN:  Can we go back to her as she approaches

11  him?  We don't need to do in the car, but when she gets out of

12  the car and approaches him.

13            (Video played.)

14            (Video paused.)

15  BY MR. PADDEN:

16  Q    Okay.  Now, you say -- I mean, I really can't see that

17  well from here, but you did say that his hands are still in

18  his pockets; right?

19  A    Yes.

20  Q    And you keep approaching.  Do you see his hands come out

21  of his pocket at some point while you were approaching?

22  A    Not when I was approaching.  It wasn't until I was

23  directly in front of him that I got him to take his hands out

24  of his pocket.

25  Q    You don't see them come out beforehand?

Rodriguez - cross - Padden                    43

1   A   No.

2   Q   I do, but you're the judge.  Obviously, this is in

3   evidence.  You know, in deliberating on the issue, you can --

4   you're saying they never come out until you are right there?

5   A   Yeah.

6   Q   Okay.  And then you feel something in his pocket there

7   and that's when you say 92, 92?

8   A   Yes.

9   Q   Okay.  I mean, you may well think it's a gun, I'm not

10  questioning you on that, but you don't actually see the gun.

11  You don't have a gun at that point; right?

12  A   No.

13  Q   Okay.  And you say 92?

14  A   Yes.

15  Q   And 92 is your code to cuff him; right?

16  A   Yes.

17  Q   It's not code for gun; right?

18  A   No.

19  Q   In fact, the police use other words sometimes to signify

20  they found a gun?

21  A   Yes.

22  Q   You probably know a lot more than I do, but I've heard

23  hot lunch for example?

24  A   Yes.

25  Q   Is it Denzel, a more recent one?

Rodriguez - cross - Padden                    44

1   A    Yes.

2   Q    Okay.  But there are terms that tell your fellow officers

3   gun?

4   A    Yes.

5   Q    Okay.  92 is not gun.  92 is simply cuff this guy?

6   A    Correct.

7   Q    Okay.  Now, you -- all right, we'll jump ahead.

8        You go to the precinct.  You are processing

9   Mr. Williams; correct?

10  A    Yes.

11  Q    Back at the precinct, you actually go and you find the

12  wanted poster that you claim you relied on in stopping him?

13  A    Yes.

14  Q    And it's still there?

15  A    Yes.

16  Q    It's still on the table with all the rest of them?

17  A    Yes.

18  Q    All right.  And now you said, on direct examination, that

19  you still weren't sure whether or not he was suspect in that

20  robbery?

21  A    I'm sorry, can you repeat that?

22  Q    I'm sorry, I can't remember what I said.

23        You said something about how you still considered

24  him a suspect in the robbery?

25  A    On the flier, correct.

SN        OCR        RPR

1   Q     Yeah, on the flier.

2   A     Yes.

3   Q     You didn't see that he was clearly not the guy in the

4   poster?

5   A     Clothing changes on the flier.  You don't see very

6   clearly what his face looks like, you know, but he still was

7   the male black light-skinned.

8   Q     Oh, okay.  All right.  You're talking about based on the

9   description of his face?

10  A     Correct.

11  Q     The jacket is clearly different, right?

12  A     Yes.

13  Q     And you guys do not charge him with the robbery that took

14  place two weeks before; correct?

15  A     Correct.

16  Q     You charged him with a gun that you recovered that night?

17  A     Yes.

18  Q     And I think he had a little marijuana on him, maybe?

19  A     Yes.

20  Q     And you didn't charge him with that?

21  A     No.

22  Q     Okay.  You just charged him with a gun that you found in

23  his pocket; right?

24  A     Correct.

25  Q     And that was the end of any investigation of him with

1  regard to that robbery; correct?

2  A    It's up to the detective squad, if they bring him up and

3  they speak to them.  It's up to them.

4  Q    But as far as you are concerned, you and the sergeant and

5  the other police officer, this was a gun arrest; right?

6  A    Correct.

7  Q    Not an arrest for robbery that had taken place two weeks

8  before?

9  A    Correct, it's not my case.

10  Q    It's not your case, okay, but it would be fair to say --

11  if you know, there was never any follow-up -- he was never

12  charged with that robbery; correct?

13  A    Not that I know of.

14  Q    Well, you know it was concluded that he was not the guy

15  that was involved in that robbery; correct?

16  A    I don't know.

17  Q    You don't know, okay.

18        Did you review other reports of other police

19  officers in connection with this?

20  A    Other police officers?

21  Q    Yeah.  Somewhere along the line, where it says he was

22  eliminated as a suspect in that other robbery?

23  A    I'm not sure, sir.

24  Q    Oh.  Fair enough.  But you concede that the jacket that

25  Qwali was wearing the night of his arrest was not the jacket

Rodriguez - cross - Padden                    47

1   that the person in the robbery wanted poster had on; correct?

2   A    Correct.

3   Q    Okay.  Let me make sure I'm not forgetting anything.

4        MR. PADDEN:  Judge, let me have a minute with

5   Mr. Williams and then I think I'm done.

6        THE COURT:  Sure.

7        (Pause in proceedings.)

8        MR. PADDEN:  I'm going to state, Your Honor, that I

9   am looking at the image captured at 22:22:37 and --

10  BY MR. PADDEN:

11  Q    I'll ask you again, Officer, but I think I know the

12  answer, but you don't see his hands out of his pocket at that

13  point, do you?

14  A    He takes out his right before he takes out his left hand,

15  but at that point he was starting to pull his hand out of his

16  pocket.

17  Q    All right, maybe that's all it is.  That's what I thought

18  I saw, but Your Honor can judge.

19  A    He made the motion.

20  Q    All right.  Let's continue and we will just finish up the

21  few minutes now of the tape and then we'll have nothing

22  further.

23        (Video played.)

24        (Video paused.)

25  BY MR. PADDEN:

1    Q    At this point is the gun still in his pocket?

2    A    Yes.

3              (Video played.)

4              (Video paused.)

5    BY MR. PADDEN:

6    Q    You obviously see the other officer pull stuff out of his

7    pocket, as well; a phone, a charger, a cord and all of that;

8    correct?

9    A    Yes.

10   Q    And that was in the same area that you say he pulled the

11   gun from; correct?

12   A    The phone was on the other side.  The charger was up on

13   his chest in a pocket here (indicating).

14   Q    Inside the jacket.

15   A    Yes.

16   Q    Okay.  And you are saying the gun was -- but on the same

17   side, only lower?

18   A    On the left side.

19   Q    All right.  And maybe I am blind, but I don't ever see

20   the gun in the video, do you?

21   A    No, not in the video.

22   Q    It's never in the video.

23             What did you do with it after you pulled it out of

24   his pocket?

25   A    I put it in my pocket.

Rodriguez - cross - Padden                49

1  Q     You put it in your pocket, but it's never visible.  The

2  seizing of the gun is simply not visible on the video;

3  correct?

4  A     Yes.

5          MR. PADDEN:  I think that's it, Judge.  Thank you.

6          THE COURT:  Did you unload it before you put it in

7  your pocket?

8          THE WITNESS:  I did not.

9          THE COURT:  Tell me about the car you were driving?

10         THE WITNESS:  It was a black Impala.

11         THE COURT:  Would it be fair to say to anybody with

12  a little street smarts it would look like an unmarked police

13  car?

14         THE WITNESS:  Yes.

15         THE COURT:  Now, you are driving around as part of

16  your responsibilities.  What exactly do you do?  What's the

17  exercise?  The three of you are in the car, I assume you are

18  making observations.  What first drew your or somebody else's

19  attention to Mr. Williams, if you recall?

20         THE WITNESS:  As he was walking down Linden, he was

21  looking left, right, over his shoulder.  Once he passed the

22  bus stop, he was the only one on the block so, at that time of

23  night, there's not too much people on the block.  So our job

24  is to observe people and that's what we were doing, just

25  looking at him.

1          THE COURT:  And whose decision was it to make the

2    u-turn and approach him?

3          THE WITNESS:  Sergeant Radoncic.

4          THE COURT:  Not your decision?

5          THE WITNESS:  No.

6          THE COURT:  Did you notice anything suspicious of

7    him?

8          THE WITNESS:  Just the way that he looked over his

9    shoulder had my attention, the description had my attention,

10   then we just wanted to get a better look at him.  When I got

11   closer is when I saw the bulge on his left side.

12         THE COURT:  Were you still in the car when you

13   noticed the bulge?

14         THE WITNESS:  Yes.

15         THE COURT:  So it was kind of its obvious?

16         THE WITNESS:  Yes.

17         THE COURT:  What was this, a .357?

18         THE WITNESS:  I don't know.

19         THE COURT:  I think it was, I recall reading the

20   papers.

21         MR. POLLACK:  I believe that's right, Judge.

22         THE COURT:  A .357 is a heavy gun.

23         THE WITNESS:  Yes.

24         THE COURT:  And so before you got out of the car,

25   you saw a bulge.  It's 10:00 or 10:30 at night in what you

1  described as a high crime area.  Would you ordinarily approach

2  somebody like that, as you did, by yourself?

3            THE WITNESS:  Yes.

4            THE COURT:  Really?

5            THE WITNESS:  Yes.

6            THE COURT:  Were you wearing a vest?

7            THE WITNESS:  Yes.

8            THE COURT:  So you saw the bulge, so once you

9  approached -- excuse me.

10            Before you got out of the car, having seen the

11  bulge, it was your intention to give it a tap?

12            THE WITNESS:  Correct.

13            THE COURT:  Lest you'd be in considerable danger

14  otherwise?

15            THE WITNESS:  Yes, it's part of my job.

16            THE COURT:  Any questions?

17            MR. POLLOCK:  Just a couple, Judge.  Just give me a

18  second, Judge.

19            THE COURT:  Well, I have one other; how did you get

20  ready to testify?  Do you have any reports?

21            THE WITNESS:  With --

22            THE COURT:  You met with the assistant?

23            THE WITNESS:  Correct.

24            THE COURT:  You didn't write any reports?

25            THE WITNESS:  Well, there was a staff report done.

1   He requested my memo book and that was it.

2           THE COURT:  So this is largely from your

3   recollection?

4           THE WITNESS:  Yes.

5           THE COURT:  All right, Mr. Padden, anything else?

6           MR. PADDEN:  Yes, Judge, if you can give me a minute

7   here.  You prompted my looking for something here that I have

8   to double check.

9           THE COURT:  I guess once you make that arrest that

10  night your night on the street is pretty much over?

11          THE WITNESS:  Yes, but it depends.  If it's a busy

12  night we'll go back out.  We'll just lodge him and continuing

13  going out.

14          THE COURT:  Do you remember if you went back out

15  that night?

16          THE WITNESS:  I don't believe I did.

17          THE COURT:  Let's take a short recess until

18  Mr. Padden finds his place and then we will resume.

19          Ten minutes.

20          MR. PADDEN:  Thank you.

21          (Recess taken.)

22          THE COURT:  Do you have anything else?

23          MR. PADDEN:  Just a couple of questions.

24          THE COURT:  Mr. Pollack, do you have questions?

25          MR. POLLACK:  I will wait to hear what Mr. Padden

1    has to say.  As of now, I have non.

2              THE COURT:  Okay.  Please be seated everyone.

3              Mr. Padden?

4              MR. PADDEN:  Thank you, Judge.

5    BY MR. PADDEN:

6    Q    Officer Rodriguez, just a couple of question to follow up

7    on what the Judge was asking.

8              If I heard correctly, I think you were saying that

9    from the car -- from your position in the car, you claimed

10   that the left side -- Mr. Williams' left side was -- I want to

11   use your exact words, but weighted down or appeared to be

12   weighted down?

13   A    Yes.

14   Q    But yet when you were in your car, his hands were in the

15   pocket; right?

16   A    Yes.

17   Q    And it was your testimony that his hands remained in his

18   pocket until you were actually right up on him?

19   A    Yes.

20   Q    And reaching out almost touching his hand; correct?

21   A    Uh-huh.

22   Q    Okay.  So, the whole time, the hands were in the pocket?

23   A    Yes.

24   Q    Both pockets, okay.  And additionally, you made some

25   comments about -- in response to the Judge's questioning,

1    about him looking over his shoulder, right?

2    A    Yes.

3    Q    Now, if I understood your testimony correctly, aside from

4    a couple of people who were at the bus stop, there was nobody

5    else on the street that night?

6    A    True.

7    Q    So it was a fairly desolate, dark and cold night out on

8    Linden Boulevard in Brooklyn of January of last year; correct?

9    A    Not dark.  It was well-lit.

10   Q    Well, okay, there were lights.  Artificial lights, but it

11   was nighttime?

12   A    Correct.

13   Q    All right.  So it was 10 o'clock or so at night, a fellow

14   walking by himself down Linden Boulevard towards Crescent;

15   correct?  And it was Crescent where the chicken shop and the

16   dollar store are; right?

17   A    On the other side of Linden.

18   Q    Yeah, you would have to cross Linden or jaywalk to get

19   there; right?

20   A    Yes.

21   Q    But it was in the direction he was going, in essence,

22   right?  It was in front of him on the other side of the

23   street?

24   A    He was on the north side and the chicken spot is on the

25   south side.

Rodriguez - cross - Padden                    55

1    Q    Yeah, so you would have to get to the crossing.  You

2    would have to cross Crescent to get there; right?

3    A    You would have to cross --

4    Q    You have to cross Linden to get there.  It was up ahead

5    of him on the other side of the street; right?

6    A    Yes.

7    Q    Okay.  And people were at the bus stop.  Now, when he was

8    looking over his shoulder, had he already passed the bus stop?

9    A    Yes.

10   Q    Okay.  And there were a couple of people at the bus stop?

11   A    Yes.

12   Q    Do you know what their gender was?  Male, female, other?

13   A    I don't remember, I'm sorry.

14   Q    Okay.  But he was like the only person out there walking

15   along and he kind of just looked over his shoulder at some

16   point; right?

17   A    He was consistently looking over his shoulder.

18   Q    Right.  Not at you, but behind him; right?

19   A    Correct.

20   Q    Okay.  And this is an area, where, you know, crimes

21   occur; right?

22   A    Yes.

23   Q    People get robbed, people get mugged?

24   A    Yes, they do.

25   Q    It's not unusual to be aware of your surroundings to make

Rodriguez - cross - Padden                          56

1   sure no one was coming out of the bushes to get you; correct?

2   A    Yes.

3             MR. PADDEN:  Thank you.  That's all.

4             THE COURT:  I am trying to get a sense of the

5   distance before you made the u-turn.  You have all these lanes

6   of traffic and service roads, maybe six.  If you count them

7   all, six lanes?

8             THE WITNESS:  Five.

9             THE COURT:  How far away would you estimate he was

10  when you first spotted him before you made the turn?

11            THE WITNESS:  He was about a block ahead

12  distance-wise and about five lanes over traffic-wise.

13            THE COURT:  So a considerable distance?

14            THE WITNESS:  Yes.

15            THE COURT:  And it was the sergeant who first

16  spotted him?

17            THE WITNESS:  Yes.

18            THE COURT:  Okay.  Thank you.

19            Anything else?

20            MR. POLLACK:  Nothing for the Government, Your

21  Honor.  Thank you.

22            THE COURT:  Officer, are you still doing this work?

23            THE WITNESS:  I am.

24            THE COURT:  The same precinct?

25            THE WITNESS:  Yes.

1          THE COURT:  The same team?

2          THE WITNESS:  No, now it's public safety.  So I'm

3     not plainclothes anymore, so it's uniform.

4          THE COURT:  Oh, you're in uniform?

5          THE WITNESS:  Correct.

6          THE COURT:  So uniformed patrol?

7          THE WITNESS:  No, public safety.

8          THE COURT:  Thank you.

9          THE WITNESS:  You're welcome.

10          THE COURT:  You can step down.

11          (Witness excused.)

12          THE COURT:  Okay.  Mr. Pollack, anything further?

13          MR. POLLACK:  Your Honor, would you like to hear

14     some argument on the issues here?  I won't belabor any points.

15          THE COURT:  I think I know what your arguments are,

16     it's in your papers.  I did have some difficulty with this

17     witness's -- understanding this witness's testimony.  I don't

18     mean that as reflection on credibility.  She talked so darn

19     fast that in this instance I would like to look at the

20     transcript before I make a ruling, but I'm a little bit

21     surprised that we don't have the critical elements here,

22     namely the jacket and the weapon.  I mean, everything focuses

23     on the observation of a bulge.  I'm not quite sure on her

24     testimony when that observation was first made, but she just

25     now recently testified that she saw it while she was in the

1   car.  So why don't we have the jacket and the weapon?  But

2   that's not my business.  I am a little bit taken aback, but

3   otherwise I would like to read her testimony before I make a

4   final judgment on whether you met your burden.

5              MR. POLLACK:  Your Honor --

6              THE COURT:  I am happy to hear any argument you want

7   to make.

8              MR. POLLACK:  Well, as an initial point, we would be

9   happy to produce the jacket and the weapon if it would be

10  useful to the Court.  There are numerous photographs of the

11  gun with the blue bandana that this officer testified to --

12             THE COURT:  I have seen that.

13             MR. POLLACK:  Which were submitted as part of the

14  exhibits the Government --

15             THE COURT:  I have seen them.  I do not question the

16  gun was seized or that there was a blue bandana, but the

17  critical element here -- and tell me if I am wrong, is the

18  observation of a bulge or the sag, call it what you will, of

19  the left pocket of this jacket.  What I find a little

20  surprising is that if she observed -- and presumably her

21  colleagues observed -- this troubling bulge, why she

22  approached this fellow quite on her own before the other

23  officers were there was really sort of somewhat striking.

24             So that's my view of it and unless you have anything

25  else to offer we will close the hearing.

Rodriguez - cross - Padden                 59

1      Mr. Padden, anything?

2      MR. PADDEN:  Just briefly, Judge.  I mean, I'm just

3   going to say I think what we have here is an old-fashioned

4   stop and frisk, which obviously is no longer permitted since

5   Floyd, and it's clear from the testimony and visually that

6   Qwali Williams was not wearing a jacket that was by any means

7   similar to that in the wanted poster.  The guy in the wanted

8   poster had a black jacket with a single reddish stripe across

9   it.  Qwali had a multi-color patchwork of red, white and blue.

10  She said she saw a bulge, and yet she says that both hands

11  were in the pocket the entire time during which she made those

12  observations and it wasn't until she was right up on him that

13  he took his hands out of that pocket right at that moment

14  where she felt it and then didn't say gun, or any code words

15  for that, simply cuff him.

16      It seems like it was an investigatory stop and

17  frisk, prematurely, without probable cause or reasonable

18  suspicion, and the rest is in my papers.

19      THE COURT:  Thank you.

20      MR. POLLACK:  Your Honor, we acknowledge that the

21  jacket was not the same kind of jacket --

22      THE COURT:  I'm not troubled by the jacket, by the

23  way.  There's a similarity.  There's a general similarity

24  between the jackets.  If you look at them now, they are

25  obviously quite different, but I'm not troubled by that.  I

1   can understand that.

2        But we're not talking about jackets here.  We're

3   talking about looking around oddly -- this is the testimony,

4   not my finding, and evidently the so-called bulge.  I'm not

5   troubled by the discrepancies between the two jackets.  I'm

6   sure the officers, if they go out on the road, they are

7   looking at these posters, pretty much looking at what the

8   individual looks like.  Not that you can tell much by that

9   poster, but I'm not troubled by that aspect.

10        MR. POLLACK:  Your Honor, I agree with the Court

11   that the key moment on the video is when Officer Rodriguez

12   walks up to the defendant and her testimony, based on what she

13   saw, and based also on her admittedly faulty memory of the

14   flier, the location, the general appearance of the defendant,

15   she was concerned seeing the bulge that that was a firearm.

16        You can see in the video she approaches cautiously,

17   she's not running up to him, and fairly rapidly sort of raises

18   her hand and she is much smaller than the defendant.  She has

19   what I would characterize as a calming poster, as she is

20   trying to get close and she places her hand.  I agree with the

21   Court that that was a courageous act, to do that; remarkably

22   courageous.

23        THE COURT:  Some might call it stupid and I don't

24   mean to be gratuitously critical, but if she thinks it's

25   possibly a gun, she should wait for her colleagues to be right

1    there.  But at any rate, go ahead.

2            MR. POLLACK:  In response to Mr. Padden's point that

3    it was a stop and frisk, the law is clear that there is no

4    seizure, in fact, the Fourth Amendment has indicated unless

5    the officers are using physical force or a show of authority

6    to compel a person, and as Officer Rodriguez testified, and

7    specifically with the video, you can't get her words in the

8    video, she testified that she said to Qwali could you hold up

9    or stop for a second, I want to talk to you.

10           That is consistent with her demeanor in the video.

11   She walks up cautiously, casually.  Although you cannot see it

12   in the video, both of the other officers walking, you can see

13   by the movement of the cameras the other officers are walking

14   sort of casually and in a not posture to escalate the

15   situation at all.  So that is sufficient to say it was not a

16   stop and frisk and, in fact, the Fourth Amendment is not

17   implicated until the moment she actually touches the

18   defendant.  He was not compelled to stop, he was asked to stop

19   and he complied.

20           THE COURT:  Well, I grant you, there has to be

21   reasonable suspicion and that reasonable suspicion is supplied

22   by the observation of the weighted -- apparently, of a

23   weighted object in the pocket of his jacket.  And if I can

24   make that finding, we are home free and we will proceed.  If I

25   can't, so be it.

1           Maybe, as Mr. Padden says, perhaps it's an old

2   fashioned stop and frisk as opposed to a legal stop and frisk.

3   There are legal stop and frisks and this may be one of them.

4           MR. PADDEN:  You can see what she saw when she got

5   out of the car.  He's standing there with his hands in his

6   pocket.  You can see that there's no -- I don't see it, but I

7   will leave it to your determination.

8           THE COURT:  I can't see anything about it at all.  I

9   see he appears to have his hands in his pockets, that's really

10  all I see.  There's not enough definition for me to make any

11  judgment as to whether or not it appeared that he had an

12  object --

13          MR. PADDEN:  Well, I submit that neither could she,

14  but you are the judge.

15          MR. POLLACK:  Your Honor, I just want to briefly

16  make a point here.  Of course, neither the witness nor I are

17  experts in technology.  It's a common observation that when a

18  camera has a wide view like that it shows so much of the

19  scene.  A person who is standing there can see better at a

20  short distance than the camera is going to capture.

21          THE COURT:  Sure.

22          MR. POLLACK:  And one additional point, because this

23  is in the papers, the motion also moves with respect to the

24  statements and the fact that the defendant was in the car

25  before he made his statements.  I won't belabor that because

Rodriguez - cross - Padden                63

1    all of the conversation is recorded on the videos and I think

2    the videos speak for themselves.  Ultimately the statements

3    made were spontaneous and not elicited by questioning.

4          THE COURT:  Well, we'll cross that bridge if we have

5    to.  Otherwise, I will ask the reporter for a copy.  If you

6    have any final comments once you see the transcript, send me a

7    letter promptly.

8          Let's reconvene in about two weeks time, Ellie, and

9    we will have a ruling and we will go from there.  Or not, as

10   the case may be.

11         Thank you for your time, fellows.

12         MR. POLLOCK:  Thank you, Judge.

13         MR. PADDEN:  Judge, I'm just curious.  I think --

14   prior, we were discussing my schedule.  I have to do some

15   traveling, for family purposes, in the next couple of weeks.

16         THE COURT:  Work out a date with Ellie, but I want

17   to do it sooner rather than later.

18         MR. PADDEN:  No, no, I get that.  I was just

19   wondering if it's perhaps possible to do that by video rather

20   than delay it.

21         THE COURT:  Sure.  If your client is comfortable

22   with it, I will have no objection.

23         MR. PADDEN:  Okay, so we'll keep that open.  I may

24   be back anyway, but I just want to keep my options open.

25         THE COURT:  I just want to do it quickly while

1    things are fresh.

2          Thank you all.

3          THE COURTROOM DEPUTY:  We will put it on for Monday,

4    May 3rd at 10:30.

5          And Mr. Pollack, I'm going to ask you please to

6    check with the MDC to see if there's a slot available.

7          MR. POLLOCK:  For video or telephone?

8          THE COURTROOM DEPUTY:  Let's say video.

9          MR. POLLOCK:  Okay.

10

11          (Matter adjourned.)

12                          - ooOoo -

13

14

15

16

17

18

19

20

21

22

23

24

25