```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - X
       UNITED STATES OF AMERICA,    :   20-CR-00075(RJD)
                                    :
                                    :
                                    :   United States Courthouse
            -against-               :   Brooklyn, New York
                                    :
                                    :
                                    :   May 5, 2021
                                    :   9:00 a.m.
       QWALI WILLIAMS,              :
                                    :
            Defendant.              :
     - - - - - - - - - - - - - - X

     TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION VIA VIDEOCONFERENCE
               BEFORE THE HONORABLE RAYMOND J. DEARIE
                    UNITED STATES DISTRICT JUDGE


                      A P P E A R A N C E S:

     For the Government:      MARK J. LESKO, ESQ.
                              Acting United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

                              BY:  ROBERT POLLACK, ESQ.
                                   HIRAL MEHTA, ESQ.
                                   (Via telephone)
                                   Assistant United States Attorneys

     For the Defendant:       FEDERAL DEFENDERS OF NEW YORK
                              One Pierrepont Plaza
                              16th Floor
                              Brooklyn, New York 11201-2776

                              BY:  MICHAEL PADDEN, ESQ.

     Court Reporter:          DENISE PARISI, RPR, CRR
                              225 Cadman Plaza East
                              Brooklyn, New York 11201
                              Telephone: (718) 613-2605
                              E-mail: DeniseParisi72@gmail.com

     Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

                (All parties present via videoconference, including the defendant.)

                THE COURTROOM DEPUTY: We are on this morning for rulings on a suppression hearing. This is USA versus Qwali Williams, docket number 20-CR-00075.

                Can I ask the attorneys please to note their appearance beginning with counsel for Government.

                MR. POLLACK: Robert Pollack for the United States.

                Good morning, Your Honor.

                THE COURT: Mr. Pollack, good morning.

                MR. MEHTA: And, Your Honor, this Hiral Mehta on the phone, Your Honor.

                THE COURT: I'm sorry, I didn't hear that.

                MR. MEHTA: This is Hiral Mehta for the Government, Your Honor, on the phone.

                THE COURT: Okay, Mr. Mehta. Welcome.

                MR. MEHTA: Good morning, sir.

                MR. PADDEN: For Qwali Williams, Michael Padden, Federal Defenders.

                Good morning, Your Honor.

                THE COURT: Mr. Padden, good morning.

                Mr. Williams, good morning.

                THE DEFENDANT: Good morning, Your Honor.

                THE COURT: Anybody have anything to say before I make my ruling?

1  MR. PADDEN: Nothing further from us, Your Honor.
2  THE COURT: Okay.
3  THE DEFENDANT: Oh, I thought --
4  MR. PADDEN: Do you want to say something, Qwali?
5  I'm sorry, Judge.
6  THE DEFENDANT: I wanted, um, to hear about the,
7  um -- the, um -- about the, um -- about the, um -- I basically
8  want to speak about this, but, um, I just let him go on. I
9  don't want to hold up anything.
10 THE COURT: Nobody is in a hurry, Mr. Williams. I
11 would generally suggest that you let Mr. Padden do your
12 talking, but feel free to say anything if you feel compelled
13 to do so.
14 THE DEFENDANT: All right.
15 MR. PADDEN: If you want to -- why don't you let me
16 speak.
17 I know what's bothering him, Judge.
18 THE COURT: Okay.
19 MR. PADDEN: I sent him the transcript as soon as I
20 was able to, and it took a while before he got it at the MDC,
21 and he was concerned about what he perceived to be a mistake
22 in the transcript. Now, he has not received my briefing. I
23 don't -- that's in the mail as well, but I don't think it's --
24 on page 45 -- I will just put it out there because I know
25 Mr. Williams is somewhat agitated about it, so if I may,

1 Judge, on page -- yeah, are you with me?

2 THE COURT: I'm with you.

3 THE DEFENDANT: Yeah.

4 MR. PADDEN: Okay. There was like a noise I heard.
5 I thought I might have had an interference with the sound.

6 On page 45 of the transcript, Judge, at line 8 and
7 9, in an answer to one of my questions -- or it actually is my
8 question, I say something to the effect that you're talking
9 about based on the description of his face is what the
10 transcript says. Mr. Williams insists that the word was
11 "race," not "face," and that's what he heard. I don't think
12 it impacts on the greater argument, but Mr. Williams has been
13 bothered by that and I -- as a courtesy to him, I put that on
14 the record for you, Your Honor.

15 THE COURT: All right. I appreciate that.

16 I don't recall the word "race," but that's not to
17 say she doesn't use the word "race," but it does not affect my
18 ruling, I can tell you, with all confidence.

19 MR. PADDEN: Very good.

20 THE COURT: I have to begin by saying, you know, I
21 come to this with two thoughts in mind.

22 All right. Don't hesitate to interrupt me if you
23 don't get it all.

24 Number one, I have enormous respect for police
25 officers who do their job well, and I fully appreciate just

1  how dangerous that job is, and I fully appreciate that the
2  constraints on them by the Constitution don't allow them to,
3  at times, achieve maximum safety and security for themselves
4  on the street. That's a decision for the founding fathers
5  exemplified by the courts trying to strike a balance between
6  personal security, personal privacy, and the needs of
7  legitimate law enforcement. I have enormous respect for them.
8  That's thought number one.
9      Thought number two is, I've been involved in too
10 many cases involving members of the New York City Police
11 Department where I have been seriously disappointed in their
12 testimony, and I try very hard to put that aside because this
13 is a different case, this is a different witness, and it would
14 be inappropriate for me to draw any inference or conclusion
15 from prior experiences, but I have to admit to you that it
16 weighs on me and my colleagues as well.
17     That said, in this case, I've decided to grant the
18 motion. Now let me tell you why.
19     We have one witness in this case, young police
20 officer, five years of experience. Officer Rodriguez, I
21 believe, is her name. I listened to her testimony, I read the
22 transcript many times, and I had a lot of problems.
23     Obviously, it all comes down to the so-called bulge.
24 This notion that from across Linden Boulevard she was able to
25 observe enough of the defendant in his clothing to connect it

1   with a flyer that she had seen in the precinct house -- one of
2   many on a table -- really does stretch my tolerance.  That
3   said, I don't think it matters.  I don't think it matters at
4   all.  The police are on the street to do their job, to be the
5   eyes and ears of law enforcement -- particularly this
6   Anticrime Unit -- in an effort to prevent; quickly
7   investigate; and their feel for the streets and the people on
8   it, it's important, part of their experience, and something we
9   should value.

10             So if a police officer -- as this sergeant did, who
11  did not testify -- decides we should check out Mr. Williams, I
12  have no problem with that whatsoever.  The mere fact that they
13  are going to turn the car around to get a closer look at
14  Mr. Williams, that's their job, that's their job, whether or
15  not there was a recent robbery in the vicinity, as we know
16  there was, so I have no problem with that.  I just don't think
17  the observations across Linden Boulevard some five lanes of
18  traffic at night could form the basis or justify that
19  decision, if indeed it needed to, but I have a problem with
20  that testimony.

21             Having turned the car around, according to the
22  witness's testimony, she observed a bulge.  Now, I can't tell
23  you how many bulge cases we've had.  It's almost like a
24  mantra -- bulge, it's a high crime area.  We hear it in all
25  these cases.  Now, I'm not suggesting this is irrelevant, and

1 I'm not being cynical, but when you have a very limited basis
2 to justify this stop, as it eventually became, this kind of
3 mantra doesn't impress me very much -- the bulge.
4     Number one, I saw no bulge.  Now, was this
5 critically acute photography?  No, it was not.  The fact of
6 the matter is, as I look at the still and as I look at the
7 video, I see no bulge.  Mr. Williams had his hands in his
8 pockets on a cold, winter night.  It was in the mid-30s.
9 Understandable.  How she could detect a bulge with two hands
10 in two pockets is something of a mystery to me, but according
11 to Ms. Rodriguez, she saw a bulge.  I saw no bulge.  I saw no
12 bulge.
13     I had anticipated, of course, that we could simply
14 reenact what happened.  A 357-magnum -- I think that was the
15 caliber of the weapon -- is a heavy weapon.  It could very
16 possibly weigh down a coat.  Obviously, we didn't do that.
17 The jacket was unavailable.  At first, I think the assistant
18 told me that it had been vouchered, but now the assistant
19 advises that it essentially was destroyed as unclaimed
20 property after a period of time in accordance with the New
21 York City Police Department policy.  I don't get that.  This
22 item of evidence is central to the justification of the police
23 department to stop this man and pat him down, so I was very
24 disappointed, to say the least, that we did not have the
25 jacket and the weapon to perhaps demonstrate to my

1  satisfaction -- not trusting thoroughly the photography and
2  the video -- that it's possible that despite the fact that his
3  hands were in his pockets that there was a discernible bulge.
4  I saw no bulge.
5          Now, the testimony of Officer Rodriguez is she saw a
6  bulge, and she arrived from the car to approach Mr. Williams.
7  I have a couple problems.  The bulge obviously suggests to an
8  experienced -- or even an inexperienced police officer -- that
9  the individual may have a weapon.  I understand that.  This is
10 a very dangerous situation, and I fully appreciate the police
11 officers being cautious, but in this situation where a gun was
12 suspected, in the context of a possible robbery suspect, I did
13 not see action by the police officer that was commensurate
14 with that kind of fear.  Officer Rodriguez approached
15 Mr. Williams, essentially, by herself.  It wasn't until a few
16 minutes later that the sergeant came into the picture, and
17 even later that the driver of the car came into the picture.
18 This doesn't strike me as an acutely dangerous situation as
19 perceived by the police officers.  Okay.  Maybe I'm misreading
20 it.
21         Officer Rodriguez then said, because she saw the
22 bulge in the left pocket, she reached out and patted the
23 pocket, and, of course, found something hard, and I think she
24 described it as L-shaped, believing it to be a weapon.
25         The video shows, and I think the still picture

1  shows, that that did not happen.  Officer Rodriguez approached
2  Mr. Williams and patted both sides of his jacket.  I invite
3  you to look carefully at that video.  I've looked at it many
4  times.  I thought originally that if she had approached
5  Mr. Williams and patted the side of the bulge, it led some
6  credibility to the notion that she had detected the suspicious
7  bulge and feared that he may be carrying a weapon.  She didn't
8  do that.  She patted both sides.
9          Now, in a sense -- in a sense -- do I blame her?
10 No.  No, I don't blame her for doing that.  It's a dangerous
11 situation.  It's a very dangerous situation.  We ask police
12 officers to involve themselves in dangerous situations; and,
13 as I said before, the Fourth Amendment doesn't let them go
14 unrestrained.  There are restraints, and the restraints here
15 are there has to be reasonable suspicion; and notwithstanding
16 a man walking on the sidewalk, ten o'clock at night in a,
17 quote, high crime area is not going to do it.  This is
18 entirely dependent on that bulge.  Were I able to credit the
19 testimony of Officer Rodriguez about the bulge, I would deny
20 the motion, but I am not, and that's essentially where I come
21 out on this.
22         Again, I go back to the beginning, I appreciate the
23 dangers inherent in this work.  That's why to be a good cop --
24 to be a good cop calls for a very special person, and, you
25 know, I'm -- excuse me just a second.

                (Pause.)

                THE COURT:  I'm reminded -- although I regard this as relatively insignificant -- that the two differences in the jackets -- the jacket that Mr. Williams wore and, of course, the jacket shown in the picture -- Hearing Exhibit 2 -- they are demonstrably different.  Now, given the distance, given the nighttime, I don't know how significant that is, but it's another reason for me to wonder and to question the credibility of the witness.  I just don't have the confidence that I need to have to deny this motion; and, therefore, I grant the motion.

                One postscript.  I was just talking about it this morning.  In a way, I'm sorry, Mr. Williams.  Not because I have any animus toward you, not at all.

                THE DEFENDANT:  Yeah.

                THE COURT:  But, you know, you've got a felony on your record, and here you are walking down Linden Boulevard carrying a gun.  You've got to straighten up or you're going to end up spending the rest of your life in jail.  I mean, if this isn't a warning to you, I don't know what is.  And who knows, I may be wrong and the Government may seek review of my decision, but the fact of the matter is, you've got to straighten up, young man, and get away from weapons before they bring you down one way or the other.

                Anything else, folks?

1     MR. POLLACK: Your Honor, Robert Pollack for the
2 Government.
3     I understand your ruling. Of course I need to
4 confer with the Solicitor General's Office as to whether the
5 Government will appeal the Court's ruling, so I would ask for
6 a date of a couple weeks out or a few weeks out to update the
7 Court. Certainly, if I have an answer before that date, we
8 will file something to indicate it.
9     THE COURT: All right.
10     Mr. Padden, do you have something to say?
11     MS. ROSTAL: Well, yes, Judge. In light of your
12 ruling, I mean, where this is such a fact-finders-based
13 ruling, I highly doubt that the Government would have any
14 success on appeal, but I defer to higher authorities than
15 mine. But Mr. Williams is in custody, Judge, has been in
16 custody for over a year now. I would ask, in light of the
17 ruling, Your Honor, that he be discharged from custody pending
18 the further proceedings.
19     THE COURT: I'm not going to do that. I'm going to
20 give the Government two weeks to decide what, if anything, to
21 do. If, at that time, the Government -- well, depending upon
22 the Government's action, we'll take appropriate action myself.
23     May 19th, Mr. Pollack. Can we have your decision by
24 May 19th? I don't know that we have to reconvene, but if you
25 provide it in writing, then we'll await further action from

1 | counsel?

2 |     MR. POLLACK:  Yes, Your Honor, I will file something

3 | by May 19th.  Thank you.

4 |     THE COURT:  Thank you, all.

5 |     Mr. Williams, good luck to you.

6 |     THE DEFENDANT:  All right.  Thank you.

7 |     MR. PADDEN:  Thank you, Judge.

8 |     Be well, all.

9 |     (Matter concluded.)

12 |     *   *   *   *   *

14 | I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

16 |   /s/ Denise Parisi               May 6, 2021

17 |    DENISE PARISI                  DATE